**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

GREAT AMERICAN LIFE                                    PLAINTIFF
INSURANCE COMPANY

V.                                                     NO. 3:16-CV-70-DMB-JMV

AVA MITCHELL TANNER,
ALITA MARGARET MITCHELL, and
CRAIG J. CHEATHAM                                       DEFENDANTS

## OPINION AND ORDER

Before the Court in this interpleader action are Alita Margaret Mitchell and Craig J.

Cheatham's motion for summary judgment, Doc. #120; and Ava Mitchell Tanner's motion for

summary judgment, Doc. #126.

## I
## Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, "[s]ummary judgment is proper

only when the record demonstrates that no genuine issue of material fact exists and the movant is

entitled to judgment as a matter of law." *Luv N' Care Ltd. v. Groupo Rimar*, 844 F.3d 442, 447

(5th Cir. 2016). "A factual issue is genuine if the evidence is sufficient for a reasonable jury to

return a verdict for the non-moving party and material if its resolution could affect the outcome of

the action." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 226 (5th Cir. 2015) (internal

quotation marks omitted). "When parties file cross-motions for summary judgment, we review

each party's motion independently, viewing the evidence and inferences in the light most favorable

to the nonmoving party." *Duval v. N. Assurance Co. of Am.*, 722 F.3d 300, 303 (5th Cir. 2013)

(internal quotation marks omitted).

In seeking summary judgment, "[t]he moving party bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (internal quotation marks and alterations omitted). If the moving party satisfies this burden, "the non-moving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks omitted). "Where the nonmoving party bears the burden of proof at trial, the moving party satisfies this initial burden by demonstrating an absence of evidence to support the nonmoving party's case." *Celtic Marine Corp. v. James C. Justice Cos., Inc.*, 760 F.3d 477, 481 (5th Cir. 2014).

## II
## Factual Background

### A.  Don Mitchell's Family

Don Mitchell was born May 24, 1934.  Doc. #128-1 at ¶ 8.  In 1963, Don married Barbara Mitchell.  *Id.* at ¶ 2.  Don and Barbara had three daughters – Ava, Phyllis, and Doncie.  *Id.*  Doncie died in 1980.  *Id.*  In 1984, Don and Barbara divorced.  *Id.*  After the divorce, Barbara settled in Florida.  *Id.*

In 1987, Don married Earlene Cotton White.  *Id.* at ¶ 3.  Earlene had two children from a previous marriage – Ronnie and Lisa.  *Id.*  Don and Earlene lived in Heth, Arkansas, and remained married until Earlene's death in 2005.  *Id.*  After Earlene's death, Don continued to live in Heth. *Id.* at ¶¶ 3–4.

In 2007, Ava, who had been medically disabled since 2001, moved to Heth.  *Id.* at ¶ 5. Three years later, in 2010, Don purchased a mobile home for Ava so that she could be closer to him.  *Id.* at ¶ 6.

In 2011, Don began communicating with Alita Cheatham. *Id*. at ¶ 8; Doc. #132-5 at 12–13, 16. Don knew Alita through her deceased husband, Pete Cheatham, who was a boyhood friend of Don, but the two had not spoken in approximately forty years. Doc. #128-1 at ¶ 8; Doc. #132-5 at 10–11. After about a month of communicating by telephone, Don began visiting Alita at her home in Horn Lake, Mississippi. Doc. #132-5 at 16. Sometime later, Alita started visiting Don in Heth. Doc. #132-5 at 18–19. Eventually, Don and Alita began to discuss marriage. Doc. #132-5 at 27; Doc. #132-7 at 30.

Also in 2011, Don "was diagnosed with COPD and later with pneumonia." Doc #128-1 at ¶ 10. While Don initially "refused to go to the hospital," at some point, he underwent treatment. *Id*. "During the treatment, the doctors found a spot on his lung, but he refused to allow a test or a biopsy." *Id*. Ava was Don's caregiver during these illnesses. *Id*.

In early 2012, Don underwent surgery to remove a spot from the side of his head. *Id*. at ¶ 11. In March 2012, shortly after Don's surgery, Ava traveled to Florida to be with her mother while her mother had knee surgery. *Id*. Ava returned to Heth in August of that year to find her father's health in a worse condition. *Id*. In November 2012, Don was diagnosed with stage IV lung cancer and began receiving treatment. *Id*.

**B. Don's Finances**

Shortly before he was diagnosed with lung cancer, Don had his attorney, Frank Dudeck, prepare a will, trust, and other estate planning documents. Doc. #128-1 at ¶ 12. Ava and her sister Phyllis, who had not seen Don since 1985, were mentioned in Don's will. *Id*. at ¶¶ 13–14. Although Don had a provision in his trust which left $200,000 to his great-granddaughters, Bianca and Emma Daily, he never put money in the trust to fund the bequest. *Id*. at ¶ 15.

The chemotherapy and radiation treatments took a toll on Don physically and mentally and,

in April 2013, he retired after years of working "on a boat on the Mississippi River." *Id*. at ¶¶ 7, 17; Doc. #126-45 at 14–15.  Because he could no longer keep up with his bills and bank accounts, Don put Ava in charge of his accounts.  Doc. #128-1 at ¶ 17.  When Don retired, he converted his work group life insurance policy through Prudential to an individual policy.  *Id*. at ¶ 18.  Don also moved his 401k account from his work to Regions Bank.  *Id*.  With some of the 401k money, Don purchased two annuities from Great American Life Insurance Company.  *Id*.  He invested the balance of his 401k money with Cetera, a Regions securities firm.  *Id*.  Ava was listed as a beneficiary on the Great American annuities, the Cetera account, and the Prudential policy.[1]  *Id*. at ¶¶ 18, 64.

According to Ava, sometime after August 2013, "Alita began meddling in [Don's] personal and financial affairs" and Don resented it.  *Id*. at ¶¶ 23–24, 26.  Ava asserts that Alita criticized Don for financially helping his adult stepchildren.  *Id*. at ¶ 24.  Ava further asserts Alita told her that she wanted to help Don get his financial affairs in order and asked for a copy of his will and burial policy but Don told Ava he did not want Alita to have a copy.  *Id*. at ¶ 25.

Alita testified during her deposition that she never asked for a copy of Don's will, was not concerned with Don's affairs and did not get involved with them, and only knew about Don's finances what he told her.  Doc. #126-45 at 22–25, 35–36, 38, 46; Doc. #126-46 at 59–60; Doc. #126-47 at 107.  She also testified that she was not after Don's money and could financially support herself.  Doc. #126-45 at 34.  According to Alita, when she asked Ava about Don's burial policy at his request, Ava responded, "[D]on't worry about it. When you put him in the ground, let me know."  Doc. #126-46 at 63.  Alita contends that Don expressed concern about what Ava was

---

[1] Ava and Phyllis were equal beneficiaries on the Prudential policy.  Doc. #128-1 at ¶ 64.

doing with his finances.[2]  Doc. #126-45 at 49–50.

### C.  Ava's Departure to Florida

Ava began to consider returning to Florida because her sister Phyllis was scheduled to have surgery on March 19, 2015, and would be unable to take care of their mother while she recovered. Doc. #128-1 at ¶ 28.  Ava was "conflicted" because both of her parents needed her help; however, Don encouraged her to go.  *Id.* at ¶ 29.  At that time, Don's stepson Ronnie was living with him and could take care of him.  *Id.*  Ava and Don had been discussing her mother's need for new dentures, hearing aids, and glasses for several months.  *Id.* at ¶ 32.  During these discussions, Don told Ava to get her mother "whatever she needs" and that he would help pay for it.  *Id.*

On March 4, 2015, Ava left for Florida but called to check on her father almost daily.  *Id.* at ¶ 34.  She took with her to Florida two folders containing information about Don's Great American policies, a receipt for his burial policy, and a checkbook.  Doc. #132-8 at 29–30.  Ava planned to return to Heth and check on her father in June 2015 but, because her mother's health was not improving, stayed longer than she expected.  Doc. #128-1 at ¶ 34.  That summer, Ava asked Don and Alita if she should return to Heth to help care for Don but they both assured her that was not necessary.  *Id.* at ¶ 35.

### D.  Craig Cheatham's Involvement in Don's Finances

At some point, Don asked Alita's son, Craig Cheatham, for financial planning advice but Craig did not want to get involved because Don had children.  Doc. #126-44 at 14, 17–20.  Don told Craig that every time he would ask Ava about his finances she would tell him, "it's all right there on the computer, Daddy" but "would never open the computer or unlock it for him to visibly

---

[2] In establishing the record, the parties rely on hearsay statements attributed to Don.  No party has objected to this form of evidence.  Accordingly, the Court will consider the proffered evidence for the purpose of deciding the motions for summary judgment.  *See BGHA, LLC v. City of Universal City*, 340 F.3d 295, 299 (5th Cir.2003) (in absence of hearsay objections, court did not err in considering hearsay affidavits for purpose of summary judgment).

look at it." *Id*. at 18. Several months later, Don asked Craig to assist him in locating his trust account but Craig declined. *Id*. at 19–20. Craig told Don that "he needed to see his trust lawyers." *Id*. at 19.

At some point, Don asked Craig to come to his house and meet with him and, on August 7, 2015, Craig complied. *Id*. at 20. While at Don's house, Craig and Don discussed Don's desire to marry Alita, Don's children allegedly stealing from him,[3] and Don's concerns about what Ava was doing with his finances. *Id*. at 24–26, 28–29. Don also asked Craig for help finding his trust account. *Id*. at 28. Don told Craig that Ava would not give him information on where his trust was located, and would not return the documents he had requested from her or the laptop with the information on it. *Id*. at 28–29.

Craig agreed to go with Don the following week to speak with a trust attorney in Little Rock regarding the location of Don's trust. *Id*. at 29–30. Don also asked Craig to go with him to Regions Bank to get a copy of his bank statements. *Id*. at 51–52. They went to Regions Bank on August 12, 2015. *Id*. While there, Don told Craig that his account had less than $18,000, when in July 2015, he had $58,000 in his money market account and $8,000 in his personal account.[4] *Id*. at 70–74, 103–04. Don was advised that he had active checking accounts in Alabama, Florida, and four in Arkansas. *Id*. at 73. Don informed bank officials that he had no knowledge of accounts in Alabama and Florida and was only aware of three of the four accounts opened in Arkansas. *Id*. at 73–75. While at the bank, Don closed all but one of the accounts. *Id*. at 53–54. Don believed

---

[3] Don had a steel door with a deadbolt as his bedroom door because when he took "medication to go to sleep, … his children would come into his room, steal his medication, checks, money, [and] whatever else they could get their hands on." Doc. #126-44 at 26.

[4] The record is unclear about whether the August 2015 figure of less than $18,000 is from Don's money market account or both his money market account and personal checking account. Further, according to Craig, because of overdraft charges in the amount of $485, Don really had a balance of $17,515 despite being issued a cashier's check for $18,000 after demanding all of the funds in his Regions Bank accounts. Doc. #126-44 at 90–91.

that Ava had forged his name on the other accounts.  *Id*. at 75.   Don became so upset that he was physically shaking and had to "sit down on the side of the truck to gather himself."  *Id*. at 78.  Don believed that Ava had ruined him.  *Id*.

After their meeting on August 12, 2015, Don told Craig that they would have to return to Regions and meet with Scottie Lackland, the branch manager for Regions' West Memphis branches, about his investments.  *Id*. at 91; Doc. #132-12 at 6.  This is when Craig learned about the Great American annuities.  Doc. #126-44 at 91–92.

Two days later, on August 14, 2015, Don signed forms revoking Ava's power of attorney and appointing Craig in her place.  Doc. #126-2; Doc. #126-3.  Don called Dudeck's office to have him prepare such forms.  Doc. #126-44 at 84.  However, Craig went, without Don, to Dudeck's office to get these documents.[5]  *Id*.  After receiving power of attorney, Craig faxed his power of attorney and Ava's revocation to Great American asking them to freeze the accounts until it heard further from him.  *Id*. at 87–88.  Craig asked Great American to freeze the accounts because Don "was moving his bank accounts to Mississippi and he had direct deposits going into bank accounts that were being closed out and [they] had to have his direct deposits changed to the new bank accounts and those forms had not shown up for Don to sign."  *Id*. at 88.  Craig also sent Cetera a request to freeze Don's account.  *Id*. at 93.

On August 17, 2015, Don returned to Regions bank with Alita and Craig.  *Id*. at 93, 101.  At that time, Don removed Ava as the beneficiary of the Great American annuities and made Alita the primary beneficiary.  *Id*. at 95; Doc. #132-12 at 22–24; Doc. #126-13.  A couple of weeks later, Great American mailed Don a letter asking him to clarify whether Alita should be a co-owner or beneficiary of the policies.  Doc. #126-44 at 141–42.  In response, the policies were changed at

---

[5] It is unclear whether Craig picked up the forms that day or if they were e-mailed.  *See* Doc. #126-44 at 84–86.

Don's request to name Alita as a co-owner and Craig as the primary beneficiary. Doc. #126-23; Doc. #126-22; Doc. #126-44 at 143. Great American sent Don another letter informing him that Alita could not be a co-owner on the annuities, only a beneficiary. Doc. #126-44 at 143. Therefore, the annuities were amended for a third time to reflect Alita as the primary beneficiary and Craig as a contingent beneficiary. *Id.*; Doc. #126-30; Doc. #126-31. The last two forms changing the beneficiary were in Craig's handwriting. Doc. #126-47 at 144–45.

On August 21, 2015, Don signed a form naming Alita and Craig as the beneficiaries of his Prudential policy. Doc. #126-19. The form was filled out by Craig. Doc. #126-44 at 138–139. Three days later, Don signed paperwork designating Alita as the primary beneficiary and Craig as the contingent beneficiary of his Cetera account. Doc. #126-20. Craig was present when the form was filled out by Terry Green, a Financial Consultant with Regions Investment Solutions. #126-44 at 139–40, 145; *see* Doc. #126–28.

### E. Don and Alita's Marriage and Don's Death

After leaving Regions Bank on August 17, 2015, Don and Alita were married in a small ceremony. Doc. #126-44 at 102–03; Doc. #121-11. Alita's children and neighbors were in attendance. Doc. #126-44 at 102–03. Ava did not know about the wedding. Doc. #128-1 at ¶ 45.

After Don and Alita were married, Ava contends that she was unable to speak with her father because Alita changed Don's telephone number and did not give it to her. *Id*. at ¶ 47. Alita, however, testified that she gave Don's new cell phone number to Ava. Doc. #126-46 at 96–97. According to Alita, she blocked Ava from her cell phone and changed Don's number because Ava would call her late at night with "a bunch of crap," and because every time Don talked to Ava he "would be so upset [that] he would take the phone and throw it across the room." *Id.* at 94–96.

On December 1, 2015, Don died at the age of 81. Doc. #128-1 at ¶ 62.

# III
## Procedural History

On April 5, 2016, Great American Life Insurance Company filed an interpleader complaint in this Court to determine whether Ava, Alita, Craig, or anyone else, is the proper recipient of the two annuities issued to Don before his death. Doc. #1. On May 27, 2016, Alita and Craig answered the complaint and Alita filed a crossclaim against Ava. Doc. #9. In her crossclaim, Alita alleges that "[w]ithout a legal basis or right, Ava Mitchell Tanner has interfered with Alita Margaret Mitchell's right to the annuity death benefits by submitting a false and scandalous letter to [Great American]" and "[a]s a result of her malicious interference," Ava "is liable for the damage Alita Margaret Mitchell has incurred …." *Id*. at ¶¶ 5–6.

On June 9, 2016, Ava answered Great American's complaint and Alita's crossclaim. Doc. #13; Doc. #14. Three weeks later, on June 30, 2016, Ava filed an amended answer to Alita's crossclaim and asserted a crossclaim of her own against Alita and Craig. Doc. #24. Ava's crossclaim alleges:

> Alita Cheatham and Craig Cheatham exerted undue influence over Don Mitchell to persuade him to disinherit his daughters, the natural objects of his bounty, and to convey his assets to them. They used undue influence to convert the following property,
>
> Regions Bank CD $150,000,
> Prudential Life Insurance policy for $186,000,
> Great American Life Insurance annuities for $120,153.25 and $117,333.54,
> Oil Interest of unknown value.

*Id*. at ¶ 41. On July 18, 2016, Alita and Craig answered Ava's crossclaim. Doc. #30.

On August 30, 2016, Phyllis Mitchell Fernandez filed a motion seeking "leave to intervene as a plaintiff in the cross claim filed by her sister [Ava] against the current defendants to the cross claim, Alita Cheatham Mitchell and Craig Cheatham." Doc. #43. The Court denied the motion to intervene because it failed to comply with the Local Rules of this Court. Doc. #138.

On September 1, 2017, Phyllis renewed her motion to intervene in Ava's crossclaim of undue influence as it relates to the Prudential policy and a trust which owns some mineral interest. Doc. #139.

On May 15, 2017, Alita and Craig filed a motion for summary judgment.[6] Doc. #120. On May 21, 2017, Ava filed a motion for summary judgment. Doc. #126. The next day, Ava filed a "Supplemental Motion for Summary Judgment by Ava Tanner," which, in substance, supplements her May 21 motion for summary judgment with her declaration.[7] Doc. #128; Doc. #28-1.

On May 30, 2017, Ava filed a response opposing Alita and Craig's motion for summary judgment. Doc. #129. On June 5, 2017, Alita and Craig filed a response opposing Ava's motion for summary judgment.[8] Doc. #132. The next day, Craig and Alita replied in support of their motion. Doc. #134. One week later, Ava replied in support of her motion. Doc. #135.[9] On August 7, 2017, the Court, on Great American's motion, issued a Rule 54(b) judgment dismissing Great American with prejudice. Doc. #137.

On December 12, 2017, the Court denied Phyllis' renewed motion for intervention on the ground that Ava's crossclaim falls outside of Rule 13(g) to the extent it relates to the Prudential

---

[6] The same day, in support of their summary judgment motion, Alita and Craig filed a memorandum brief, Doc. #122; and a document titled, "Undisputed Issues of Material Fact," Doc. #121, to which they attached seventeen exhibits. The Court's local rules require that exhibits to a motion be attached only to the motion, and do not authorize the filing of a separate "undisputed issues" document. *See* L.U. Civ. R. 7(b)(2). To the extent the "undisputed issues" document is considered part of the motion, the motion exceeds the allowable page limit. *See* L.U. Civ. R. 7(b)(2)(B). However, if it is considered part of the memorandum brief, the combined page limit for the original and reply briefs is not exceeded. Ava did not object to the filing of the document, and it has been considered by the Court.

[7] If construed based only on its title, the "Supplemental Motion for Summary Judgment by Ava Tanner" would be untimely. However, in the absence of any objection to its filing by Alita and Craig, the Court construes the filing as a supplement to Ava's timely May 21 summary judgment motion given that the declaration attached is cited in Ava's timely May 21 memorandum brief.

[8] Also on June 5, 2017, Alita and Craig, without objection by Ava, filed a "Notice of Supplemental Filing" to correct an exhibit citation in three footnotes in their "undisputed issues" document. Doc. #131.

[9] Ava's reply filed June 13, 2017, is untimely. *See* L.U. Civ. R. 7(b)(4). As such, it has not been considered for the purpose of deciding her summary judgment motion.

policy and the mineral trust. Doc. #153. One week later, Ava filed a motion requesting leave to file a supplemental brief in opposition to Alita and Craig's motion for summary judgment to address the impact of *Travelers Insurance Co. v. First National Bank*, 675 F.2d 633 (5th Cir. 1982), an opinion on which this Court relied when denying Phyllis' motion to intervene. Doc. #157. The Court granted leave and, on January 4, 2018, Ava, and Alita and Craig, filed supplemental briefs on the pending motions for summary judgment. Doc. #165; Doc. #166.

## IV
## Alita and Craig's Motion for Summary Judgment

In their motion for summary judgment, Alita and Craig ask the Court to uphold the designation by Don of his wife Alita as beneficiary of the Great American annuities and to dismiss the crossclaim filed against them by Ava. Doc. #120. Alita and Craig submit that Ava "is not asserting conversion of her property, rather she is claiming that her Father's property was taken. She has no derivative right." Doc. #122 at 5. They also submit that Alita's designation as beneficiary should be upheld due to a lack of clear and convincing evidence that Don was incapable of exercising independent judgment in making that designation. *Id.* at 3–5. Alita and Craig further contend that, to the extent Ava's crossclaim implicates assets other than the Great American annuities, the crossclaim exceeds the scope of Rule 13(g).[10] *Id.* at 5–7.

---

[10] Without discussion, Alita and Craig's brief also refers broadly to issues of standing and subject matter jurisdiction. Though less than clear, it appears Alita and Craig argue that Ava lacks standing to challenge, and this Court lacks jurisdiction to decide, issues related to property of Don's estate. During a telephonic conference, Alita and Craig conceded that none of the assets, except for the trust which contains an oil and gas interest, are estate property. To the extent there is a question whether the Court lacks jurisdiction to decide the crossclaim related to the oil and gas interest, the Court declines to resolve the issue here.

Of course, "it is the duty of a federal court to decide, *sua sponte* if necessary, whether it has jurisdiction before the merits of the case can be addressed." *Filer v. Donley*, 690 F.3d 643, 646 (5th Cir. 2012). However, a court may resolve a case on a "non-merits issue that avoids the 'arduous inquiry' into subject matter jurisdiction." *O'Hara v. Donahoe*, 595 F. App'x 367, 370 n.2 (5th Cir. 2014) (citing *Gonzalez v. Crosby*, 545 U.S. 524, 532 n.4 (2005)). While this Court has been unable to find a case characterizing a Rule 13(g) dismissal, the United States Supreme Court, in ruling that a forum non conveniens dismissal falls under the category of "non-merits," focused on the fact that such a dismissal "denies audience to a case on the merits" and acts as "a determination that the merits should be adjudicated

Ava responds that Alita and Craig's motion "totally misstates the thrust of [her crossclaim]" and that her crossclaim is for undue influence, not lack of mental capacity. Doc. #129 at 1. As such, Ava argues that summary judgment should be denied because mental capacity is not an issue in this case. *Id.* Ava also argues that her crossclaim is proper under Rule 13(g) of the Federal Rules of Civil Procedure. *Id.* at 2–3.

## A. Great American Annuities

Alita and Craig argue that they are entitled to the Great American annuities because Ava cannot show that Don lacked mental capacity to make the change. However, as explained below, Ava does not challenge Don's mental capacity to make the change. Rather, Ava argues that the change is void for undue influence. While the issue of capacity is sometimes relevant to an undue influence inquiry, no party argues it is relevant here. Accordingly, the motion will be denied to the extent it seeks to establish ownership based on the issue of mental capacity.

## B. Other Assets

Federal Rule of Civil Procedure 13(g) provides:

> A pleading may state as a crossclaim any claim by one party against a coparty if the claim arises out of the transaction or occurrence that is the subject matter of the original action or of a counterclaim, or if the claim relates to any property that is the subject matter of the original action.

Craig and Alita argue that "none of the [non-Great American assets] of Ms. Tanner's cross-claim have been interpleaded into the Court and thus are not within the subject matter of this Interpleader action." Doc. #122 at 5–6. Though included in Craig and Alita's motion for summary judgment, this Court interprets this scope argument, which would result in dismissal without prejudice, as

elsewhere." *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 432 (2007) (alterations omitted). Because a Rule 13(g) dismissal, like a forum non conveniens dismissal, merely denies audience to a case on the merits, this Court concludes that a claim may be dismissed on Rule 13(g) grounds before reaching the issue of subject matter jurisdiction.

seeking dismissal under Federal Rule of Civil Procedure 12(b)(6). *See Rivera v. PNS Stores, Inc.*, 647 F.3d 188, 197–98 (5th Cir. 2011) ("[G]ranting a motion for summary judgment always results in a dismissal with prejudice."); *see generally United States v. DCS Dev. Corp.*, 590 F.Supp. 1117, 1122–23 (W.D.N.Y. 1984) (dismissal of crossclaim as beyond scope of Rule 13(g) was without prejudice).

In addressing the propriety of Ava's crossclaim, the Court draws guidance from the Fifth Circuit's decision in *Travelers Insurance Co. v. First National Bank of Shreveport*, 675 F.2d 633 (5th Cir. 1982). In *Travelers*, an insurance company brought an interpleader action to determine the ownership of the proceeds of a life policy in light of a change of beneficiary form allegedly executed by the insured. One of the claimants to the life insurance proceeds sought to assert declaratory judgment crossclaims on the issue of the insured's capacity to execute numerous change of beneficiary forms during a specific time period, with such periods including the change of beneficiary form at issue in the underlying interpleader action. Because the competing claimants were not diverse, the Fifth Circuit considered whether the court had ancillary jurisdiction over the crossclaims. The Fifth Circuit ultimately held that because the crossclaims "were not 'logically dependent' upon the original claim over which the district court did have jurisdiction and thus [were] not proper cross-claims under Rule 13(g), they were not supported by the doctrine of ancillary jurisdiction." *Travelers*, 675 F.2d at 638. In doing so, the Fifth Circuit, quoting *Amco Construction Co. v. Mississippi State Building Commission*, 602 F.2d 730, 732–33 (5th Cir. 1979), stated that "[i]t matters not if we ask whether this claim is a proper cross claim under Rule 13(g) or whether this claim is supported by ancillary jurisdiction. The analysis is substantially the same and *our result would be the same*." *Id.* (emphasis added).

In her supplemental brief in support of her motion for summary judgment, Ava argues that

the decision in *Travelers* was overruled by statute in 1990 when Congress enacted the supplemental jurisdiction statue.[11]  Doc. #166.  Specifically, Ava maintains that "[t]he Fifth Circuit's decision in <u>Travelers</u> was supplanted by Congress in 1990 when it passed the Supplement [sic] Jurisdiction statute," which provides in relevant part:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).  Ava argues that § 1367 says nothing about logical dependency, rather it requires "that [the claims] be 'so related that they form part of the same case of controversy under Article III of the United States Constitution.'"  Doc. #166 at 6 (ellipses omitted).  Thus, Ava contends that a "cursory review of this new statute and Rule 13(g) total [sic] undercuts the Fifth Circuit's statement in <u>Travelers</u> that the tests for both are substantially the same."  *Id*. at 6–7.

The Court finds Ava's argument to be without merit.  In enacting the supplemental jurisdiction statute, Congress simply codified the doctrines of ancillary jurisdiction and pendent jurisdiction.  *See Peacock v. Thomas*, 516 U.S. 349, 354 n.5 (1996).  Regardless, even if § 1367 altered the "logical dependency" requirement for ancillary jurisdiction, it would have had no impact on the portion of the *Travelers* holding relevant here – that Rule 13(g) includes a logical dependency requirement.

Regarding Rule 13(g), Ava argues that instead of relying on *Travelers*, the Court "should … apply the logical relationship test articulated by the Fifth Circuit in [*Revere Copper & Brass*

---

[11] Ava also argues that her crossclaim should not be dismissed because she will "just refile them in this court under diversity jurisdiction."  Doc. #166 at 2.  Because the purpose of the supplemental briefing was solely to consider the impact of *Travelers* on Ava's crossclaim, the Court will not consider this argument.

*Inc. v. Aetna Casualty & Surety Co.*, 426 F.2d 709 (5th Cir. 1970)]." Doc. #166 at 1. The Court agrees that the test for determining whether a crossclaim is properly asserted under Rule 13(g) is the logical relationship test. *See Amco Const. Co.*, 602 F.2d at 733 (applying logical relationship test to determine whether Rule 13(g) crossclaim proper); *see also United States v. Aronson*, 617 F.2d 119, 121 (5th Cir. 1980) ("In [the Fifth Circuit], we have adopted the 'logical relationship' test."). However, application of the logical relationship test does not preclude a logical dependency requirement.

In *Travelers*, one of the claimants, relying on *Revere*, argued that its crossclaim against the co-executors "met [the logical relationship] test because … nearly all [of the claims] depended on the same single operative fact, Kilpatrick's mental capacity during the period in question, that was determinative of the original action." *Travelers*, 675 F.2d at 638 (internal quotation marks omitted). The Fifth Circuit concluded:

> Although this argument might seem plausible at first glance, it cannot be sustained …. The key is the requirement that, for a nondiverse claim to be considered ancillary to a diverse one, it must not only arise from the same core of operative facts as does the diverse claim, but it must also bear a *logical relationship* to that claim.

*Id.* (emphasis added). Because the Fifth Circuit in *Travelers* held that the inquiries for ancillary jurisdiction and Rule 13(g) were the same, it held that under the logical relationship test, an interpleader crossclaim must have a logical dependency on the original claim. To this end, the Fifth Circuit explained:

> Looking first at the attempted cross-claims relating to the change of beneficiary forms other than Travelers', it might initially appear that they were all "closely" related to the original claim, as indeed in one sense they undoubtedly were. They were all allegedly executed on the same day, under the same conditions, and by the same person. This does not alter the fact, however, that all these claims did not together constitute an "entire, logically entwined lawsuit," but were instead only a series of "independent and separate" claims, albeit ones involving the same central factual inquiry. … [I]t simply cannot be said that these claims were "logically

dependent" on the resolution of the question as to who was entitled to the proceeds from the Travelers policy.

*Id*. at 640. This decision represents binding law. Therefore, this Court finds that *Traveler*'s framework is appropriate for considering whether Ava's crossclaim satisfies the requirements of Rule 13(g).

This case, like *Traveler*'s, involves an interpleader action for insurance proceeds and a crossclaim related to other properties. While the crossclaim at issue here, like the crossclaims at issue in *Travelers*, involves the same central factual inquiry (capacity in *Travelers* and undue influence here), this overlap in inquiries does not create a valid claim under Rule 13(g). *See Metro. Life Ins. Co. v. Katz*, No. 6:13-cv-1236, 2014 WL 12625777, at *3 (M.D. Fla. Jan. 10, 2014) (undue influence crossclaims related to other property not properly asserted under Rule 13(g) in interpleader action); 7 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1715 (3d ed.) ("[A] cross-claim, which may be attempting to establish the tortfeasor's liability above and beyond the fund, typically will not be very closely related to the interpleader claim.").[12] Accordingly, Ava's crossclaim will be dismissed to the extent it implicates assets other than the Great American annuities.

## C. Ava's Conversion Claim

"[A] conversion claim requires proof of a wrongful possession, or the exercise of a dominion in exclusion or defiance of the owner's right, or of an unauthorized and injurious use, or

---

[12] *See also State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 535 (1967) ("where a stakeholder, faced with rival claims to the fund itself, acknowledges—or denies—his liability to one or the other of the claimants, … the fund itself is the target of the claimants. It marks the outer limits of the controversy."); *Anthem Life Ins. Co. v. Olguin*, No. 1:06–cv–1165, 2007 WL 2904223, at *3 (E.D. Cal. Oct. 3, 2007) ("Except for the cross-claim related to the life insurance proceeds, the proposed cross-claims [seeking to invalidate a beneficiary designation, real property transfers, day trades, and 'all other transfers,'] do not arise out of the transaction or occurrence that is the subject matter of the original action, nor do they relate to property that is the subject matter of the original action or seek relief on behalf of the party asserting them."); *Metro. Life Ins. Co. v. Cronenwett*, 162 F.Supp.2d 889, 900 (S.D. Ohio 2001) (dismissing crossclaims relating to funds in personal savings plan because claims did not arise out of subject matter of life insurance interpleader action).

of a wrongful detention after demand." *Covington Cty. Bank v. Magee*, 177 So.3d 826, 829 (Miss. 2015). Ava failed to address Craig and Alita's argument that her conversion claim fails for lack of an ownership interest. The Court deems this failure an abandonment of the claim. *See In re Dallas Roadster, Ltd.*, 846 F.3d 112, 126 (5th Cir. 2017) (failure to include defense of claim in response to motion for summary judgment amounted to abandonment of claim).

## V
## Ava's Motion for Summary Judgment

Ava's crossclaim against Craig and Alita alleges:

> Alita Cheatham and Craig Cheatham exerted undue influence over Don Mitchell to persuade him to disinherit his daughters, the natural objects of his bounty, and to convey his assets to them. They used undue influence to convert the following property,
>
> Regions Bank CD $150,000,
> Prudential Life Insurance policy for $186,000,
> Great American Life Insurance annuities for $120,153.25 and $117,333.54,
> Oil Interest of unknown value.

Doc. #24 at ¶ 41.

Ava moves for summary judgment on her crossclaim on grounds that the undisputed proof raises a presumption of undue influence that cannot be rebutted with clear and convincing evidence from disinterested witnesses. Doc. #126. Alita and Craig respond that Ava's motion should be denied because there are no material facts genuinely in dispute and portions of the crossclaim exceed the scope of Rule 13(g). Doc. #133.

### A. Non-Great American Assets

Because this Court has already dismissed the portion of Ava's crossclaim related to the non-Great American assets, Ava's summary judgment motion will be denied in this regard.

### B. Great American Annuities

Ava alleges claims of conversion and undue influence premised on a theory that Alita and

Craig exerted undue influence over Don to remove her and designate themselves as beneficiaries to the Great American annuities. She seeks a declaration that the changes in beneficiaries are void and a judgment for the value of the assets. *See* Doc. #24 at ¶¶ 42–43. As explained above, Ava abandoned her conversion claim.

"[U]ndue influence is the substitution of the will and intent of the beneficiary for that of the testator." *In re Estate of Johnson v. Johnson*, No. 2016-ca-338, 2017 WL 6379658, at *9 (Miss. Dec. 14, 2017). If a transfer of an interest was caused by undue influence, "then as a matter of law the transfer is voidable." *In re Fankboner*, 638 So.2d 493, 495 (Miss. 1994).

In Mississippi, a litigant may establish a rebuttable presumption of undue influence in conveying a testamentary gift by showing (1) a confidential relationship exists and (2) the beneficiary in the confidential relationship was actively involved in some way with procuring, preparing, or executing the will or other testamentary instrument, or mental infirmity of the testator.[13] *In re Will of Wasson*, 562 So.2d 74, 78 (Miss. 1990); *Noblin v. Burgess*, 54 So.3d 282, 288 (Miss. Ct. App. 2010). "In other words, there must be some showing that the beneficiary abused the relationship either by asserting dominance over the testator or by substituting her intent for that of the testator." *Wasson*, 562 So.2d at 78. (alterations omitted). "Suspicious circumstances surrounding the [conveying of a gift] also raise the presumption." *In re Last Will & Testament & Estate of Smith*, 722 So.2d 606, 612 (Miss. 1998). When circumstances give rise to a presumption of undue influence, the burden shifts to the beneficiary to rebut the presumption by clear and

---

[13] "[T]he rules of law are different regarding gifts testamentary and gifts *inter vivos* where a confidential relationship exists between the testator/grantor and the beneficiary/grantee." *Madden v. Rhodes*, 626 So.2d 608, 618 (Miss. 1993). The Mississippi Supreme Court has held that transfers of interests are considered gifts inter vivos when a person can take possession of the assets prior to the grantor's death. *Id.* at 18–19. With annuities, "the beneficiary's right to the funds only arises upon the owner's death." *Allstate Life Ins. Co. v. Estate of Reed*, 619 F.Supp.2d 262, 269 (S.D. Miss. 2007). Accordingly, the changes of beneficiaries here are properly considered testamentary. *See id.* ("[T]he purchase of an annuity is arguably testamentary in nature ….").

convincing evidence.  *In re Estate of Holmes*, 961 So.2d 674, 680 (Miss. 2007).

### 1. Craig

#### a. *Presumption of undue influence*

Ava argues in a conclusory manner that "[t]he facts of this case undeniability [sic] show a confidential relationship between Mitchell [sic], his new wife Alita and his new stepson Cheatham [sic]."  Doc. #127 at 16.  Nowhere in their response to Ava's motion for summary judgment do Alita or Craig deny the existence of a confidential relationship between Don and Craig.

In determining whether a confidential relationship exists, the Mississippi Supreme Court considers factors such as:

> (1) whether one person has to be taken care of by others, (2) whether one person maintains a close relationship with another, (3) whether one person is provided transportation and has their medical care provided for by another, (4) whether one person maintains joint accounts with another, (5) whether one is physically or mentally weak, (6) whether one is of advanced age or poor health, and (7) whether there exists a power of attorney between the one and another.

*In re Estate of Holmes*, 961 So.2d at 680.

It is undisputed that Don and Craig became close very quickly and that Don trusted Craig to assist him with financial affairs.  Craig transported Don to the bank to check on his accounts and make changes to them, set up a meeting with the bank's vice-president on Don's behalf, and faxed documents concerning Don's insurance policies.  It is also undisputed that Don was of advanced age, was in poor health, and was physically weak.  Most important, Craig had power of attorney over Don's affairs.

Under these circumstances, the Court finds that a confidential relationship existed between Don and Craig.  *Smith*, 722 So.2d at 612 (although testatrix initiated contact with attorney and set up appointment to change will, confidential relationship existed between testatrix and Smiths because Smiths controlled testatrix's finances, had power of attorney, and drove testatrix to

attorney's office); *Wright v. Roberts*, 797 So.2d 992, 998 (Miss. 2001) (confidential relationship found where testator was in poor health and was dependent on grantee for transportation to health care and for assistance in paying bills). Accordingly, a presumption of undue influence will arise against Craig if he was actively involved in some way with procuring, preparing, or executing the testamentary instruments at issue here. *Wasson*, 562 So.2d at 78.

Ava argues the presumption of undue influence exists because Craig was present for, and involved in, the preparation and signing of several documents with her father, including the change of beneficiary forms for the Great American annuities. Doc. #127 at 17–18. Ava also points out that "[i]n filling out some of the forms, [Craig] made himself a beneficiary in his own handwriting." *Id*. at 18. Ava contends that it is suspicious that within a week of Craig and Don becoming reacquainted, Craig became intimately involved in every aspect of Don's finances and even received power of attorney from him. *Id*. at 17–18. Alita and Craig do not deny Craig's participation in assisting Don with changing the Great American annuities' beneficiary from Ava to him and Alita. Indeed, Craig and Alita testify about Craig's involvement in assisting Don.

Because there is undisputed evidence that a confidential relationship existed between Craig and Don, and that Craig substantially assisted Don with changing the beneficiaries on the annuities, the Court finds that a presumption of undue influence exists as to Craig. *Allstate Life Ins. Co.*, 619 F.Supp.2d at 273 (presumption of undue influence established based on daughter's undisputed involvement in father's signing of change of beneficiary form).

#### b. *Rebutting presumption of undue influence*

In her motion, Ava argues that Alita and Craig cannot rebut the presumption of undue influence because they have no disinterested witnesses. Doc. #127 at 22–23.

A beneficiary can rebut the presumption of undue influence by establishing by clear and

convincing evidence that (1) he acted in good faith; (2) the grantor had full knowledge and deliberation of his actions and the consequences of those actions; and (3) the grantor exhibited independent consent and action. *In re Estate of Holmes*, 961 So.2d at 680. In evaluating these elements, the Court may not rely on the testimony of interested parties. *Id*. ("[T]he testimony of the proponents or interested parties is not sufficient to rebut the presumption of undue influence."); *In re Estate of Smith*, 827 So.2d 673, 678, 680 (Miss. 2002) (evidence to rebut presumption of undue influence must come from someone besides beneficiary). A party's failure to prove any of these elements by clear and convincing evidence is fatal to rebutting the presumption of undue influence. *Allstate Life Ins. Co.*, 619 F.Supp.2d at 269.

### i.    Good faith

In considering whether the beneficiary acted in good faith, the Court considers (1) the identity of the initiating party in seeking preparation of the instrument; (2) the place of the execution of the instrument and in whose presence; (3) the consideration and fees paid, if any; (4) by whom paid; and (5) the secrecy and openness of the execution of the instrument. *Holmes*, 961 So.2d at 682.

Regarding these factors, Alita and Craig argue:

> 1) [Don] initiated the change in beneficiary for the GALIC annuities, and [Scottie], who had a long-standing relationship with [Don,] completed the change in beneficiary forms …; 2) the change was made at the West Memphis bank branch, the bank that [Don] used for years, in the presence of [Scottie], [Don and Alita,] and Craig …; 3) there was no consideration paid; and 4) as mentioned, the execution was done openly at the bank branch. While there were later changes made at [Alita's] home, those changes were merely at the instruction of [Great American] and the end result was unchanged – that [Alita] was the primary beneficiary of the annuities.

Doc. #133 at 7.

With respect to the first factor, Scottie, the banker, testified that it was Don's idea to change

the beneficiary on the Great American annuities. Doc. #132-12 at 35. In an affidavit, Tarishan Winder, the notary public who notarized the third change of beneficiary form, avers that Don "was oriented, understood what he was signing and was not influenced or coerced in anyway in executing the documents." Doc. #132-18 at 1. The record indicates that Craig was involved in many aspects leading up to the change in beneficiaries. Craig drove Don to the bank each time Don went. Craig also went with Don to speak with Dudeck about drafting a document revoking Ava's power of attorney and appointing Craig. Further, it was Craig who faxed the power of attorney paperwork to Great American asking them to freeze Don's accounts. More concerning is the fact that it was Craig who called and set up the meeting with Scottie to change the beneficiary of the annuities. Taken together, the Court concludes that the first factor weighs against a finding of good faith. *See Holmes*, 961 So.2d at 682–83 (first factor weighed against good faith when there was no clear evidence testator was initiating party but was clear evidence grantee played major role in initiating preparation of will).

As to the second factor, it is undisputed that the first change in beneficiary of the Great American annuities was executed at Regions Bank in the presence of Scottie, Craig, and Alita. But, there has been no evidence presented regarding the location of the subsequent beneficiary changes.[14]

Factors three and four involve the consideration of fees paid, and by whom. There is nothing in the record to suggest that any consideration or fees were paid. As to the factor of secrecy and openness of the execution, the record reflects that the initial change in annuities was done at the bank.

Considering all of this, the Court finds that good faith has not been demonstrated by clear

---

[14] Alita and Craig assert that the later changes to the policies were made in Alita's home. Doc. #133 at 7.

and convincing evidence.  *Howell v. May*, 983 So.2d 313, 318–19 (Miss. Ct. App. 2007) (no good faith when grantee set up appointment with attorney to deed house to grantee, transported grantor to appointment, and was present when deed executed).

*ii.    Knowledge and deliberation*

In evaluating the grantor's knowledge and deliberation at the time of execution of the instrument, the Court considers (1) his awareness of his total assets and their general value, (2) an understanding by him of the persons who would be the natural inheritors of his bounty under the laws of descent and distribution or under a prior will and how the proposed change would legally affect that prior will or natural distribution, (3) whether non-relative beneficiaries would be excluded or included and, (4) knowledge of who controls his finances and business and by what method, and if controlled by another, how dependent is the grantor/testator on him and how susceptible to his influence.  *Holmes*, 961 So.2d at 684.  In addressing the knowledge element, the Mississippi Supreme Court has suggested that a court "should give a thoughtful deliberation to all of these factors. No set amount of time is stated as required, but a positive factor to overcome the undue influence presumption is a mature and thoughtful weighing of the legal consequences of [his] action." *Id*. at 684–85.

Alita and Craig argue that Don "was keenly aware of and understood the effects of each of these elements. In fact, it was the result of these elements that prompted him to make the sudden and urgent change to his finances."  Doc. #133 at 9.  Alita and Craig further argue:

> [Don] was aware of his assets and their worth and discovering their depletion understandably encouraged him to change the GALIC annuity beneficiary, among others. … [Ava] took advantage of his computer illiteracy to control and deplete his money. Undoubtedly, [Don] was aware that his changing the beneficiary would result in just that. That was his sole intent. He did not want his daughter who would not account for his assets and depleted his assets to reap the benefit of the annuities. [Don] was fully aware of his relation to his wife, Alita, and his step-son, Craig. With respect to the last factor, again, it was the result of [Ava's] controlling and

23

manipulating [Don's] finances that prompted the change in beneficiaries. After realizing money was missing, [Don] sought Craig's help in getting his finances in order. Multiple independent witnesses have attested to this and confirmed that [Don] was fully aware of his actions, they were deliberate and not the product of coercion or undue influence.

*Id.*

While Craig and Alita contend that Don had full knowledge of his finances, Ava argues that her father was confused about the total amount of money he possessed. Scottie testified that Don would periodically stop by the bank and ask him for his (Don's) accounts balances. Doc. #132-12 at 16. At most, this evidence shows that Don knew how much money was in *certain* accounts. This is not evidence that Don was aware of the general value of his *total* assets.

Next, there is no indication that Don did not understand who his natural inheritors were or the consequences of him removing Ava as beneficiary of the Great American annuities. Dr. Rhonda Gentry, who treated Don from December 2012 until August 20, 2015, testified that it was her opinion that Don had the capacity and understanding to make a decision regarding the beneficiary forms. Doc. # 132-17 at 13–14; Doc. #132-9. However, there is no testimony from disinterested witnesses regarding Don's deliberations in deciding to replace Ava as beneficiary. *In re Estate of Smith*, 827 So.2d at 682 (although testator knew what his assets were and who his relatives were, court could not conclude what deliberation testator made in making his decision because only testimony regarding this was from interested witness).

As to the third factor, Don did not make any conveyances to non-relatives. Accordingly, the Court finds this factor to be neutral.

As to the last factor, there is no indication that Don did not understand that by giving Craig power of attorney, Craig would oversee his finances. The record does, however, indicate that Don was dependent on Craig in assisting him with his finances.

Considering all factors, the Court finds that full knowledge and deliberation has not been established through clear and convincing evidence.

### iii. Independent consent and action

Finally, in rebutting a presumption of undue influence, the grantee must demonstrate that the grantor exhibited independent consent and action in naming the beneficiaries. "[U]nlike the other two prongs, there is no express list of factors." *In re Estate of Thomas*, 122 So.3d 111, 119 (Miss. Ct. App. 2013). In the past, the Mississippi Supreme Court has held that the best way to show independent consent and action is to provide "advice of a competent person disconnected from the beneficiary devoted wholly to the [grantor's] interest[s]." *Id*. "Though still a relevant consideration, this requirement has been absolved by more recent precedent, which has instead required a showing of the grantor's independent consent and action based on all of the surrounding facts and circumstances." *Id*. (internal quotation marks omitted).

Here, disinterested witnesses such as Scottie, Dr. Rhonda Gentry, and Tarishan, testified that in August 2015, they believed Don's mind was sharp, Don was capable of making his own decisions, Don led the meetings at the bank, and Don knew exactly what he wanted to do. However, there has been no testimony presented that Don consulted with outside sources for advice on how to move forward in addressing his concern that Ava was stealing his money, or about who he should designate as beneficiaries of the annuities. Additionally, no one besides Craig and Alita were involved in the changing of the beneficiary of the annuities. Further, the compressed timeline of Craig's involvement—two days after Craig found out about the Great American annuities, he received appointment as power of attorney and, a couple weeks later, became a beneficiary of the annuities—weighs against a finding of independent action. Even more troubling is the fact that Craig twice filled out paperwork making himself a beneficiary of the Great

American annuities.

Under these circumstances, the Court concludes that Craig and Alita fail to establish that Don exercised the independent consent and action necessary to rebut the presumption of undue influence. *See Thomas*, 122 So.3d at 128–29 (despite testimony that grantee did not participate in conversation between testator and will drafter regarding the will, and affidavits that testator was of sound mind at the time of the execution of the will, no finding of independent consent and action when testator did not seek independent advice from person not connected with grantee, grantee transported testator to execute will, and grantee chose location of execution).

### iv.   Findings

The Court finds that Craig has not presented clear and convincing evidence to rebut the presumption of undue influence. Therefore, Ava's motion for summary judgment will be granted to the extent it requests a declaration that the changes of beneficiaries of the annuities are void.

## 2.   Alita

Mississippi law makes clear that if a transfer of an interest was caused by undue influence, "then as a matter of law the transfer is voidable." *In re Fankboner*, 638 So.2d at 495. Further, Mississippi has rejected the view of partial validity when there has been a showing of testamentary incapacity. *See generally Moore v. Jackson*, 157 So.2d 785, 786 (Miss. 1963) (in case involving several legatees, court held that "it is uniformly held that testamentary incapacity invalidates the entire will."). Because undue influence is closely related to incapacity, it stands to reason the rule against partial validity would apply here too. As such, because the Court has found that Craig exerted undue influence over Don with regard to changes in beneficiaries of the annuities and has declared such transfers void, it need not address Ava's undue influence claim to the extent it is asserted against Alita.

## VI
## Alita's Crossclaim and Interpleader Relief

Neither Alita's crossclaim nor the relief requested in the underlying interpleader complaint were expressly addressed in the motions for summary judgment. However, a court may grant summary judgment in favor of a non-movant so long as the "[t]he acts dispositive of this issue were presented and argued at length …, and the [other party] had a full and fair opportunity to develop the record [on the issue]." *Jensen v. Snellings*, 841 F.2d 600, 618 (5th Cir. 1988); *see Barrett v. Netherlain*, No. 12-193, 2013 WL 5408538, at *12 (C.D. Cal. Sep. 25, 2013) (collecting cases for proposition that court may sua sponte grant summary judgment on claims turning on same issues). Both the interpleader relief sought, and Alita's crossclaim alleging Ava's wrongful interference with Alita's interest in the annuities, turn on the same issue decided above – the validity of the changes in beneficiaries of the annuities. Because this Court has concluded that the changes are void, summary judgment in Ava's favor will be granted as to both. *See Johnson v. Warnaco, Inc*., 426 F.Supp. 44, 47 (S.D. Miss. 1976) ("Any interference is not wrongful and actionable if undertaken by someone in the exercise of a legitimate interest or right, which constitutes privileged interference.") (internal quotation marks omitted).

## VII
## Conclusion

For the reasons above, Craig and Alita's motion for summary judgment [120] is **GRANTED in Part and DENIED in Part**. The motion is granted to the extent it seeks dismissal of Ava's crossclaim based on assets other than the Great American annuities at issue in the interpleader; and to the extent it seeks dismissal of Ava's crossclaim for conversion premised on the annuities. The motion is denied in all other respects.

Ava's motion for summary judgment is [126] is **GRANTED in Part and DENIED in**

**Part**.  It is granted to the extent it seeks summary judgment on Ava's crossclaim of undue influence regarding the Great American annuities.  It is denied to the extent it seeks summary judgment on other assets.

Summary judgment on the underlying interpleader action [1] is **GRANTED** in Ava's favor.

**SO ORDERED**, this 2nd day of February, 2018.

/s/**Debra M. Brown**
**UNITED STATES DISTRICT JUDGE**