**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**GREAT AMERICAN LIFE INSURANCE**                                 **PLAINTIFF**
**COMPANY**

**V.**                                              **NO. 3:16-CV-70-DMB-JMV**

**AVA MITCHELL TANNER,
ALITA MARGARET MITCHELL, and
CRAIG J. CHEATHAM**                                      **DEFENDANTS**

**consolidated with**

**AVA MITCHELL TANNER and**                                **PLAINTIFFS**
**PHYLLIS FERNANDEZ**

**V.**                                              **NO. 3:18-CV-23-DMB-JMV**

**ALITA CHEATHAM MITCHELL and
CRAIG CHEATHAM**                                        **DEFENDANTS**

## ORDER

Following Don Mitchell's death, his biological daughters, Ava Mitchell Tanner and Phyllis Fernandez, sued Don's stepson, Craig Cheatham, and Don's widow, Alita Cheatham Mitchell, alleging they unduly influenced Don in his modification of the beneficiaries of his assets. A bench trial was held on (1) Ava's claims that Alita and Craig exerted undue influence to cause Don to change the beneficiary from Ava to Alita on two Great American Life Insurance Company annuities, a Prudential insurance policy, a CETERA account, and a trust; (2) Phyllis' claims that Alita and Craig exerted undue influence to cause Don to change the beneficiary from Phyllis to Alita on the Prudential policy and the trust; and (3) Ava and Phyllis' claims that Craig and Alita violated Mississippi's Vulnerable Persons Act. At trial, Alita and Craig made an oral motion to dismiss the Vulnerable Persons Act claims, which the Court took under advisement. In accordance

with Rule 52(a) of the Federal Rules of Civil Procedure, the Court's findings of fact and conclusions of law are set forth below.

# I
## Standard

"In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately." Fed. R Civ. P. 52(a)(1). This rule "exacts neither punctilious detail nor slavish tracing of the claims issue by issue and witness by witness." *Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998). However, a court may not make a factual finding which is unsupported by substantial evidence, based on a misinterpretation of evidence, or clearly against the preponderance of credible testimony. *Meche v. Doucet*, 777 F.3d 237, 241–42 (5th Cir. 2015). Credibility determinations should be based on a witness' "demeanor and inflection," and whether "[d]ocuments or objective evidence may contradict the … story; or [whether] the story itself [is] … internally inconsistent or implausible on its face." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985).

# II
## Factual Findings

Applying the standard above, the factual findings below considered (1) the trial testimony of Ava, Craig, Alita, Phyllis, Charles Cheatham, Terry Green, and Tarishan Winder; (2) the video depositions of Phyllis Harden, Scottie Lactland, Rhonda Gentry, and Stephen Jones, which were admitted into evidence without objection; and (3) the documentary exhibits admitted into evidence.

### A. Relevant Relationships and Initial Estate Planning

Don and Barbara Mitchell married in the 1960s and had three children—Ava, Phyllis, and Donice. Donice passed away in 1980. About four years after Donice's death, Don and Barbara divorced. At the time of the divorce, Don, Barbara, Ava, and Phyllis lived in Pine Bluff, Arkansas.

In 1987, Don married Earline White Cotton, and moved to Heth, Arkansas.  While living in Heth, Don worked as a boat captain for Pine Bluff Sand and Gravel.  As part of his employment benefits, Don designated Ava and Phyllis as beneficiaries of a Prudential life insurance policy valued at $186,000.  P-6; Doc. #219 at 5.  Earline died of cancer in 2005.  Two years later, Ava moved to Heth to be closer to her father.

In 2011, Don, who was then approximately seventy-six years old, developed "respiratory issues."  Don went to the doctor and was diagnosed with COPD.  Tests also revealed a "spot" on one of his lungs.  The same year, Don developed a spot on his forehead, which he had removed.

Also in 2011, Don began communicating by telephone with Alita Margaret Mitchell, who then lived in Horn Lake, Mississippi.  Don knew Alita through his friendship with Alita's husband, who had died earlier in 2001.

In March of 2012, Ava traveled to Florida to care for her mother following a knee replacement surgery.  When Ava returned to Heth in August, she found that her father's respiratory condition had deteriorated and that he was experiencing "urology issues."  Ava scheduled Don appointments with a urologist and with an oncologist, Rhonda Gentry.  In November 2012, Gentry diagnosed Don with stage IV lung cancer.

Around the time of his cancer diagnosis, Don met with Frank Dudeck, an attorney Don had previously used regarding issues of his sister's guardianship, for the purpose of estate planning.  As a part of this process, Don executed on November 9, 2012, a last will and testament which left his estate to a revocable trust.  The same day, Don executed documents creating the Don Mitchell Revocable Trust.  As executed, the trust left "[a] sum equal to the greater of $100,00 or 25% of trust assets" to each of Don's great-grandchildren Emmia and Bianca.[1]  Ava and Phyllis were

---

[1] Emmia and Bianca were Don's step-great-grandchildren, presumably, through his second wife, Earline Cotton.

named trustees and were included among the beneficiaries of the trust. Additionally, Don named Ava as the beneficiary of two annuities valued at $120,153.25 and $117,333.54 which were issued by Great American Life Insurance Company ("GALIC") through Regions Bank,[2] and a CETERA account with $148,504.14 in benefits.

In January of 2013, Don, who had been hospitalized "a couple of times" for pneumonia, began receiving chemotherapy in Little Rock, Arkansas. Throughout the year, Ava stayed with Don during his hospitalizations and his chemotherapy appointments. During that time, Ava assisted her father with paying bills. Due to his health problems, Don retired in April 2013.

In the fall of 2013, Don was "doing a little bit better" and started on a "maintenance-type therapy." Also in the fall of 2013, Alita traveled to Heth to visit Don. After her initial visit, Alita visited Don in Heth approximately once a month. Don also visited Alita in Horn Lake. During his visits to Horn Lake, Don spent time with Alita's son Craig Cheatham, who lived in Jonesboro, Arkansas. Don and Craig "started having dinners with each other."

On February 18, 2014, Don executed an amendment to the trust. The amendment modified the provision regarding Emmia and Bianca to state that "[t]he sum of $100,000.00 of trust assets shall remain in trust for the sole use and Benefit of Emmia … and the sum of $100,000.00 of trust assets shall remain in trust for the sole use and benefit of Bianca." The amendment further added a provision stating "[a]ll mineral rights shall be equally distributed to" Ava and Phyllis.

### B. Ava's 2015 Trip to Florida

In the fall of 2014, Ava, who was still caring for Don, began having discussions with her mother Barbara about Barbara's deteriorating health. In January of 2015, Ronnie, one of Earline's children from a previous marriage, and his girlfriend moved in with Don to assist with Don's care.

---

[2] Regions sold fixed annuities through its subsidiary GALIC.

Because Ava trusted Ronnie to care for her father, she "decided that [she] would take a couple of months and go down [to Florida] and see what was going on with [her] mom." Before her trip, Ava spoke with her father, who "expressed the desire to help [Barbara] with purchasing" certain medical necessities. Ava traveled to Florida in March 2015 to be with her mother. One month after Ava left for Florida, Don had surgery to remove a tumor in his bladder.

While Ava was in Florida, she monitored Don's checking accounts and observed that Ronnie, who oversaw purchasing items for Don, had engaged in a "lot of extra activity." According to Ava, she and Don agreed to open a joint checking account with Regions Bank in Florida to control Ronnie's spending. Also, consistent with Don's desire to help his former wife, Ava used Don's funds to purchase dentures, glasses, and hearing aids for her mother.

### C. August and September 2015

In early August 2015, Don called Craig and asked him to come to his home in Heth to help him answer some questions about his bank accounts, and to ask for Alita's "hand in marriage."[3] Don, Alita, and Craig agreed that Don and Alita should get married and move to Horn Lake. During this visit, Don took Craig into his bedroom for the purpose of showing Craig Don's financial records.

Don showed Craig "everything" and, according to Craig, asked Craig, "Would you help me go through these and figure out where my trust account is?" Although initially reluctant to become involved, Craig said "sure," and advised that Don go see his banker. Don agreed and asked if Craig would come to the bank with him. Craig agreed. At Don's request, Craig took two boxes of documents home with him.

On or about August 4, 2015, at Gentry's office, Don executed a form which removed Ava's

---

[3] The fact and account of this meeting is based on Craig's testimony, which the Court finds less than credible in parts. The credible portions of Craig's testimony are described below.

ability to make healthcare decisions for him and placed the power in Alita. According to Gentry, while Don suffered from chemotherapy-related fatigue, she believed Don had the capacity and understanding to make beneficiary determinations during the time period relevant here.[4]

The following week, on August 12, 2015, Don and Craig met at the Regions Bank branch in West Memphis, Arkansas. The two men met with a bank associate who informed Don that he had approximately $18,000 in open accounts in Arkansas, Florida, and Alabama. According to Craig, Don appeared confused as to why there were open accounts in Florida and Alabama. Don obtained statements for these accounts. Don was upset because he believed there should have been approximately $60,000 in the accounts. Don closed all the Regions Bank accounts and left with a check for $18,000. As they left the bank, Don appeared physically shaken and stated that Ava "ruined" him.

The following day, on August 13, 2015, Don met with Dudeck and Dudeck's legal assistant Stephen Jones. The meeting was also attended by Craig, who did about half of the talking at the meeting. At the meeting, Don complained about Ava allegedly misappropriating his funds and expressed a desire to grant Craig power of attorney. The next day, at a hotel, Don executed a power of attorney, prepared by Dudeck, in favor of Craig. The power of attorney was notarized by a notary arranged by Craig but paid for by Don. As soon as the power of attorney was executed, Craig faxed to Prudential and Great American a copy of the power of attorney, along with the message, "please freeze both of these accounts until you are contacted by me."

On August 17, 2015, Don, Alita, and Craig met at the West Memphis Regions Bank. Don and Craig[5] met with Scottie Lactland, branch manager of the West Memphis branch. Don told

---

[4] Don left Gentry's care approximately two weeks later.

[5] Alita was present during the meeting but did not participate in the conversation.

Lactland that he believed Ava was stealing from him and that he "wanted her removed from everything." Accordingly, Don executed a series of documents, notarized by Lactland, which purported to list Alita as co-owner and beneficiary of the annuities and which changed the addresses associated with these accounts to Horn Lake, Mississippi. Don also listed Alita as co-owner on his remaining Regions accounts. The forms were filled out by Lactland and signed by Don. According to Lactland, Don was acting normally during the August 17 meeting. Lactland felt that Don understood the impact of his decisions and did not believe that "somebody [was] subverting [Don's] individual thought or opinion for what he wanted to do." Later that day, Don and Alita were married, and Don moved in with Alita.

The day after the wedding, Craig called Drew Atkinson, the office manager at Pine Bluff Sand and Gravel, Don's former employer, and requested forms for Don to change his address and beneficiaries on the Prudential life insurance policy. The request was forwarded to Phyllis Harden, another employee at the office. Phyllis called Don "to double check that Don wanted these." Don stated that he remarried, was "very happy," and had asked Craig to find out what he needed to do to change his beneficiaries and his address. Phyllis and Don spoke for approximately fifteen minutes. Don confirmed he wanted to change the beneficiary because he felt Ava had misappropriated some of his money. During this conversation, Phyllis had "no doubt on [the] clarity of [Don's] mind." Pine Bluff Sand & Gravel sent the form to Don. Craig filled out the form for the Prudential policy to name himself and Alita as beneficiaries. On August 21, 2015, Don signed the form, which listed his address as Horn Lake, Mississippi.

On August 24, 2015, Craig drove Don and Alita to a Regions Bank location in downtown Memphis, Tennessee, to change the beneficiary on his CETERA account. At the bank, Don executed a form, prepared by Terry Greene, an employee of Regions, which listed Alita as the

primary beneficiary of the account, with Craig as the primary contingent beneficiary. Greene spoke with Don for approximately thirty minutes to "[m]ake sure he was not just doing something that was just a knee jerk." After the conversation, Greene had no concerns about Don making the change.

Three days later, Don and Dudeck spoke on the phone regarding potential changes to the trust. The telephone appointment was scheduled by Craig.

At some point, Regions sent a letter to Don stating that the changes he made to the GALIC annuities were improper because they listed Alita as a co-owner, which was not allowed because "you could have a beneficiary, but you could not have a co-owner." On August 30, 2015, Craig filled out, and Don executed, revised change of beneficiary forms for the two GALIC annuities. These new forms, which were notarized at Alita's home, listed Alita as owner of the annuities and Craig as the primary beneficiary. Craig called the notary to come to the house; Don paid for the notary's services.

In August or September of 2015, Dudeck and Jones, at Don's direction, prepared a second amendment to Don's trust. Jones recalled that Don was lucid during the interaction and seemed primarily concerned about the distribution of his money. Jones observed no impairment of judgment, only "fatigue."

The second amendment was executed in Horn Lake by Don on or about September 12, 2015, and was notarized by Tarishan Winder. Winder testified that she was called to the house by Craig for the notary services. As amended, the document changed the trustees to Craig and Alita. It also granted to Alita the mineral interests previously left to Ava and Phyllis, removed the $200,000 gift to Emmia and Bianca, and left approximately $1,000 each to Phyllis, Ava, and other relatives.

On or about September 25, 2015, Don revised the GALIC forms once more. As revised, the annuities list Don as the owner, Alita as the primary beneficiary, and Craig as the contingent beneficiary. The September 25 modifications were notarized by Winder.

Also on September 25, 2015, Don executed a third amendment to the trust, also notarized by Winder. The amendment, which was prepared by Dudeck and Jones, was "initiated by a phone call from Craig Cheatham" and "confirmed" with Don, reduced the amount left to Phyllis, Ava, and the other relatives to $500. The notary appointment was made and paid for by Craig. Winder could not recall the precise details of her September 12 and September 25 visits but she testified that Don was "jovial and professional" and did not appear to be under the influence of anyone.

### D. Ava and Phyllis' Attempts to Contact Don

Earlier, in August 2015, Ava noticed a withdrawal from Don's Regions account which "zeroed the account out." When Ava questioned her father about the withdrawal, he said that "he was being audited, and that Craig … was helping with that." Throughout the month of August, Ava tried to speak with her father but was unable to do so. Eventually, Ava discovered that Alita had changed Don's phone number. When Ava tried to call Don's new number, other people would answer the phone but would not let her speak with Don.

Ultimately, Phyllis called Alita's house and spoke with Don. During the conversation, Don told Phyllis that Craig was helping with his finances and that Craig had told Don that Ava was stealing from him and had abandoned him.

Don died on December 1, 2015. Following Don's death, the relevant financial institutions, over Ava's objection, distributed the funds in the CETERA account to Alita. Alita also received the proceeds of the Prudential policy. The GALIC funds were interpleaded into this Court. It appears the trust was never funded and that the only item of value in the trust was the mineral

interests which, by virtue of the amendments, belong to Alita.

### III
### <u>Jurisdiction over Mineral Interests</u>

As explained above, the revocable trust in question includes certain interests in mineral rights. This Court sua sponte directed post-trial briefing on the subject of "[w]hether the mineral rights at issue are subject to this Court's jurisdiction or to the probate exception under the applicable law." The parties submitted the relevant briefing as directed.

"Federal jurisdiction ordinarily exists over lawsuits that could have been brought in a state court, so long as complete diversity of citizenship and the requisite amount in controversy are present. For compelling historical reasons, however, a federal court has no jurisdiction to probate a will or administer an estate." *Breaux v. Dilsaver*, 254 F.3d 533, 536 (5th Cir. 2001) (cleaned up). In practice, the probate exception:

> reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court. But it does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction.

*Marshall v. Marshall*, 547 U.S. 293, 311–12 (2006). "After *Marshall*, the probate exception only bars a federal district court from (1) probating or annulling a will or (2) seeking to reach a *res* in custody of a state court by endeavoring to dispose of such property." *Curtis v. Brunsting*, 704 F.3d 406, 409 (5th Cir. 2013) (internal quotation marks omitted).

As an initial matter, "[a]lthough an *inter vivos* trust may, on occasion, serve as the functional equivalent of a will, there is no warrant for expanding the probate exception to cover such trusts." *Oliver v. Hines*, 943 F. Supp. 2d 634, 639 (E.D. Va. 2013). Accordingly, consideration of the trust, and the mineral interests specifically, does not involve probating or annulling the will.

Next, "[a]ssets placed in an inter vivos trust generally avoid probate, since such assets are owned by the trust, not the decedent, and therefore are not part of the decedent's estate." *Curtis*, 704 F.3d at 409–10. Even if the trust (including the mineral interests) could be deemed a part of Don's estate, "if there never was a state court proceeding over the *res* or all state court proceedings involving the *res* have ended, then there is nothing to interfere with and the probate exception is inapplicable." *Wolfram v. Wolfram*, 78 F. Supp. 3d 758, 765 (N.D. Ill. 2015) (collecting cases). There is no dispute that no probate proceeding was opened regarding Don's estate. For all these reasons, the Court concludes that the probate exception does not apply.

## IV
## Undue Influence Claims

Phyllis and Ava, either singularly or together, assert undue influence claims against Craig and Alita regarding the changes in beneficiaries on the two Great American annuities, the Prudential insurance policy, the CETERA account, and the trust (collectively, "Assets"). Following the bench trial, the Court directed the parties to address "[w]hether Mississippi law or the law of another state applies to each claim, right and/or asset at issue in this case."

### A.  Applicable Law

"A federal court sitting in diversity applies the forum state's choice-of-law rules to determine which substantive law will apply." *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 770 (5th Cir. 2016). Where there is no conflict of laws, Mississippi law should control. *Hinton v. Pekin Ins. Co.*, 268 So. 3d 543, 551 (Miss. 2019). "Where there is a conflict of laws, Mississippi follows the Restatement (Second) Conflict of Laws." *Williams v. Clark Sand Co.*, 212 So.3d 804, 809 (Miss. 2015). Under this approach:

> Once a true conflict is established, Mississippi's choice of law test consists of three steps:
> (1) Determine whether the laws at issue are substantive or procedural. If they are
> procedural, the inquiry ends and Mississippi law applies; (2) If substantive, classify the

laws as either tort, property, or contract; and (3) look to the relevant section of the Restatement (Second) of Conflict of Laws. With regard to the last step, Mississippi resolves conflict-of-laws questions using the "significant relationship" test found in the Restatement (Second) of Conflict of Laws (1971).

*Williams v. Liberty Mut. Ins. Co.*, 741 F.3d 617, 620–21 (5th Cir. 2014) (cleaned up).  In applying this approach, "the law of a single state does not necessarily control every issue in a given case." *Boardman v. United Servs. Auto Ass'n*, 470 So. 2d 1024, 1031 (Miss. 1985).  Rather, a court must apply the "test to each question presented, recognizing that the answer produced in some instances may be that the law of [Mississippi] applies and on other questions in the same case the substantive law of another state may be enforceable."  *Id.*  The burden of identifying a conflict rests with the party asserting the foreign law.  *See Shortie v. George*, 233 So. 3d 883, 897 (Miss. Ct. App. 2017) (party waived right to challenge choice of law by failing to identify issue).

Here, Craig and Alita have identified only one conflict—that Arkansas law recognizes a presumption of undue influence only "if the parties are in a confidential relationship and the grantee is the dominant party."  Craig and Alita contend this is a true conflict because Mississippi law contains no such requirement.

Under Mississippi law:

the rules of law are different regarding gifts testamentary and gifts *inter vivos* where a confidential relationship exists between the testator/grantor and the beneficiary/grantee. The prior holdings of this Court indicate a presumption of undue influence only arises in the context of gifts by will when there has been some abuse of the confidential relationship, such as some involvement in the preparation or execution of the will. On the other hand, with a gift *inter vivos*, there is an automatic presumption of undue influence even without abuse of the confidential relationship. Such gifts are presumptively invalid.

*Madden v. Rhodes*, 626 So. 2d 608, 618 (Miss. 1993).  However, "a confidential relationship between a surviving spouse and a deceased spouse does not create a presumption that the surviving spouse used undue influence" for either testamentary or inter vivos gifts.  *Estate of Langston v.*

*Williams*, 57 So. 3d 618, 621 (Miss. 2011).

In Arkansas, a presumption of undue influence exists as to an inter vivos gift "when it is shown that a confidential relationship existed between the donor and a dominant donee." *Burns v. Luucich*, 638 S.W.2d 263, 269 (Ark. Ct. App. 1982). In testamentary cases, "[t]he existence of a confidential relationship between a primary beneficiary and a testator gives rise to a rebuttable presumption of undue influence." *In re Jelinek*, 566 S.W.3d 156, 160 (Ark. Ct. App. 2018). Even assuming there is a true conflict between Mississippi and Arkansas law based on Arkansas' requirement that the grantee be "dominant" (for inter vivos gifts) or "primary" (for testamentary instruments), Mississippi law would control.

"Mississippi law determines whether a matter is properly characterized as a tort or a contract because that inquiry is part of Mississippi's choice-of-law rules." *Williams v. Liberty Mut. Ins. Co.*, 741 F.3d 617, 621 (5th Cir. 2014). While it appears Mississippi courts have not characterized the question of undue influence as to a gift or inheritance, the weight of authority holds that the use of undue influence to interfere with a gift or inheritance of a plaintiff—the claim here—sounds in tort. *See, e.g.*, *Giardina v. Fontana*, 733 F.2d 1047, 1050 (2d Cir. 1984) ("The heart of Giardina's complaint was her allegation that the assignment of her interest in her deceased father's estate was obtained by undue influence and fraud. This is essentially a common law tort action."); *Sierra v. Williamson*, No. 4:10-cv-79, 2013 WL 3456988, at *5 (W.D. Ky. July 9, 2013) ("Undue influence … more clearly sounds in tort."); *Bunting v. Carter-Bunting*, No. 11-cv-414, 2012 WL 460458, at *3 (S.D. Cal. Feb. 13, 2012) (undue influence claim sounded "primarily in tort"). Consistent with this authority, this Court concludes the torts section of the Restatement provides the relevant framework for determining the appropriate law.

As explained by the Fifth Circuit:

Section 145 of the Restatement directs that tort actions should be governed by the law of the state with the most significant relationship to (1) the occurrence and (2) the parties, and suggests types of contacts that should be considered for such a determination:

Contacts to be taken into account to determine the law applicable to an issue include:

(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,
(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

The Restatement also instructs that the weighing of these tort-specific factors should be guided by the seven general choice-of-law considerations set out in § 6:

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

*Ellis v. Trustmark Builders, Inc*., 625 F.3d 222, 226 (5th Cir. 2010) (cleaned up).

"In the case of personal injuries or of injuries to tangible things, the place where the injury occurred is a contact that, as to most issues, plays an important role in the selection of the state of the applicable law."  Restatement (Second) of Conflict of Laws § 145 cmt. e (1971).  However, for certain torts, such as fraud or misrepresentation, "there may be little reason in logic or persuasiveness to say that one state rather than another is the place of injury."  *Id*.  Where there is "no one clearly demonstrable place of injury," "the place where the conduct occurred is given particular weight."  *Id*.  Because interference of inheritance and gift claims have no true place of injury, the place of the wrongful conduct is often controlling.  *Torosian v. Garabedian*, 206 F.

Supp. 3d 679, 682 (D. Mass. 2016).

Here, the location of the relevant conduct—the alleged undue influence of Craig and Alita—is less than clear. It appears the alleged conduct began when Don and Craig lived in Arkansas and Alita lived in Mississippi but continued after Don moved to Mississippi to live with Alita. However, the actual change of beneficiaries did not occur until Don moved to Mississippi to live with Alita.[6] "[I]t follows that any sort of interference that could have occurred would have occurred in that state." *Torosian*, 206 F. Supp. 3d at 682. This fact combined with Don and Alita's residence in Mississippi weighs the § 145 tort factors in favor of applying Mississippi law. Such a conclusion, which applies the law of Mississippi to the execution of documents in Mississippi by a Mississippi resident, allegedly at the behest of coercive actions taken predominantly in Mississippi, is consistent with all the general considerations of § 6. Accordingly, in the absence of any other identified conflict, the Court concludes that Mississippi law governs the undue influence claims in this case.

### B. Undue Influence Claims against Craig

Ava asserts undue influence claims against Craig related to the change of beneficiaries on the Great American annuities, the Prudential policy, the CETERA account, and the trust. Phyllis' undue influence claims against Craig relate to the changes in beneficiaries on the Prudential policy and the trust.

"Under Mississippi law, undue influence is exerted where a beneficiary's intent is substituted for the intent of the grantor." *Great Am. Life Ins. Co. v. Tanner*, 766 F. App'x 82, 87 (5th Cir. 2019) (citing *Estate of Johnson v. Johnson*, 237 So. 3d 698, 711 (Miss. 2017)). The

---

[6] Craig and Alita contend that the annuity beneficiaries were changed the day of the wedding, when Craig was still residing in Arkansas. However, it is undisputed the changes were improper and required new change of beneficiary forms. Even if the changes had some legal effect, the forms also changed Don's address to Mississippi, suggesting that at the time of the change, he was no longer a resident of Arkansas.

common law long recognized that undue influence would render a will or other testamentary instrument invalid. *See Meek v. Perry*, 36 Miss. 190, 228 (1858). Over time, this rule was extended to inter vivos gifts. *See Madden v. Rhodes*, 626 So. 2d 608, 618 (Miss. 1993). In this sense, the doctrine has been used as a means for challenging a will in probate, *see In re Estate of Dabney*, 740 So. 2d 915, 918 (Miss. 1999); or a deed, *Hall v. Bowman*, 749 So. 2d 182, 184 (Miss. Ct. App. 1999) (in declaratory action regarding validity of deeds, noting undue influence was a "relevant element[] on [the] controversy regarding the validity."). It may also form the basis of an independent complaint to invalidate a transfer. *See In re Smith*, 170 So. 3d 530, 533 (Miss. Ct. App. 2014).

No matter how raised, a claim of undue influence is evaluated in two parts. *See Smith v. Smith*, 574 So. 2d 644, 651 (Miss. 1990). First, a court must ask whether "the circumstances give rise to a presumption of undue influence." *Id*. If they do, the burden shifts to the grantee or beneficiary to rebut the presumption by clear and convincing evidence. *Id*.

Here, the parties stipulated that Ava and Phyllis have established a "presumption of undue influence as to Craig … in connection with the beneficiary designations of the assets." Doc. #219 at 4. Accordingly, the question becomes whether Craig has rebutted this presumption by clear and convincing evidence.

"A presumption of undue influence may be rebutted if a beneficiary establishes the following by clear and convincing evidence: (1) good faith on the part of the grantee/beneficiary; (2) the grantor had full knowledge and deliberation of his actions and their consequences; and (3) the grantor/testator exhibited independent consent and action." *Tanner*, 766 F. App'x at 89 (cleaned up) (quoting *In re Estate of Holmes*, 961 So. 3d 674, 680 (2007)). To determine whether these requirements have been met, a court must ask whether:

[e]xcluding the testimony of the grantee, those acting in the grantee's behalf (such as the attorney), and any others who could have a direct or indirect interest in upholding the transfer (such as grantee's family), is there any other substantial evidence, either from the circumstances, or from a totally disinterested witness from which the court can conclude that the transfer instrument represented the true, untampered, genuine interest of the grantor[.]

*In re Estate of Holmes*, 961 So. 2d at 681.

When considering independent consent and action, "Mississippi courts consider 'all of the surrounding facts and circumstances.'" *Tanner*, 766 F. App'x at 92 (quoting *Vega v. Estate of Mullen*, 583 So. 2d 1259, 1264 (Miss. 1991)). "One way of showing independent consent and action is if the testator acted on the advice of a competent person who was 'disconnected from the grantee' and 'devoted wholly to the grantor/testator's interest.'" *Id*. (quoting *Estate of Holmes*, 961 So. 2d at 680). Conversely, "[t]he participation of the beneficiary/grantee, or someone closely related to the beneficiary, arouses suspicious circumstances that negate independent action." *Harris v. Sellers*, 446 So. 2d 1012, 1015 (Miss. 1984).

Here, there is simply no evidence that Don was acting on the advice of a competent person disconnected from him with respect to any of the changes at issue in these cases. While Don interacted with numerous individuals in making the changes, it appears these interactions were limited simply to the third parties confirming that Don wanted to make each decision.[7] More important, there is no dispute that Craig, who is a beneficiary of each asset except the trust, and is closely related to Alita, a primary beneficiary of the trust, was a participant in each challenged change.

While Mississippi courts have not clearly articulated a test for participation, relevant case law suggests the term is defined broadly. For example, a beneficiary has been deemed to have

---

[7] The absence of a proper advisor is particularly apparent with respect to the annuities, for which Don executed three changes in an approximately one-month period.

participated in a change when she "dialed the phone and handed it to [the grantor] so [the grantor] could have his financial advisor send him the change of beneficiary form," and then mailed the completed form to the financial advisor. *Hill v. Harper*, 18 So. 3d 310, 320 (Miss. Ct. App. 2009). A beneficiary has also been held to have "participated" in a change when she drove the grantor to a lawyer's office and then "participated" in the meeting during which the change was made. *Howell v. May*, 983 So. 2d 313, 316, 320 (Miss. Ct. App. 2007).

For the changes to the annuities, Craig met Don at the bank to make the initial changes, and then arranged for a notary to come to Don's home to make the later changes, even paying for the notary on one occasion. Additionally, Craig filled out the second beneficiary change forms for Don to sign. For the change to the life insurance policy, Craig contacted Don's former employer to request a change of beneficiary form and then filled out the form himself. For the CETERA account, Craig drove Don to the Regions Bank branch and then was present when Don made the change of beneficiary. Finally, for the changes in the trust, Craig traveled with Don to the initial meeting with Dudeck and Jones; a meeting at which Craig spent half the time speaking. Subsequently, Craig arranged for a telephone call between and Don and Dudeck and later "initiated" a change to the trust. The two amendments to the trust were notarized by a notary obtained by Craig.

In sum, because Don was not advised by a disconnected person with respect to any of the challenged changes, and because Craig participated in each change, Craig has not shown by clear and convincing evidence that Don exhibited independent consent and action with respect to any of the transactions. Accordingly, Phyllis and Ava must prevail on their undue influence claims against Craig and the transfers of the Assets.

Because Craig exercised undue influence over Don with respect to the transfers of the

Assets, the transfers which Phyllis and Ava argue were improper must be deemed void. *In re Fankboner*, 638 So.2d 493, 495 (Miss. 1994) (if a transfer of an interest was caused by undue influence, "then as a matter of law the transfer is voidable."). Title to the mineral interests, therefore, will revert to Phyllis and Ava. Additionally, Phyllis and Alita are entitled to the GALIC annuities funds interpleaded with the Court. Furthermore, to the extent the CETERA accounts and life insurance proceeds were paid to Alita, Craig is liable to Phyllis and Ava for the value of the life insurance funds and to Ava for the value of the CETERA account. *In re Smith*, 170 So. 3d 530, 542 (Miss. Ct. App. 2014) (when funds have been taken as a result of a transfer voided by undue influence, the proper remedy is to order return of the amount of the funds).

### C. Undue Influence Claims against Alita

As explained above, "a confidential relationship between a surviving spouse and a deceased spouse does not create a presumption that the surviving spouse used undue influence" for either testamentary or inter vivos gifts. *Estate of Langston*, 57 So. 3d at 621. Rather, a plaintiff must also show "the surviving spouse used undue influence." *Id*. To meet this burden, the plaintiff must show "that the devisee spouse used undue methods for the purpose of overcoming the free and unrestrained will of the testator so as to control his acts and to prevent him from being a free agent." *Id*. at 621.

Here, the only acts taken by Alita identified by Phyllis and Ava are that Alita attended the August 24, 2015, at Regions Bank, and that Alita changed Don's phone number without informing Ava and then refused to let Ava speak to Don when she called. First, there can be no doubt that attending a change of beneficiary meeting is not an "undue method." Furthermore, while the record is contradictory as to whether Alita informed Ava or Phyllis of the new phone number, the allegation that Alita refused to let Don speak to his daughters is undermined by Phyllis' own

testimony that the one time she tried to call Alita's house, Alita let her speak with Don. Under these circumstances, the Court concludes that the trial record is insufficient to raise a presumption of undue influence as to Alita and that, therefore, the undue influence claims against her must fail. *See Estate of Langston v. Langston*, 141 So. 3d 28, 32–33 (Miss. Ct. App. 2014) ("secretiveness" standing alone, is insufficient to raise a presumption of undue influence as to a spouse).

However, an innocent recipient of a transfer caused by undue influence may nevertheless be obligated to "make restitution to the person from whom the money was wrongfully obtained" when "the pleadings … gave … fair notice that the plaintiff was seeking restitution … under an 'innocent recipient' theory …." *Jensen v. Daniels*, 786 N.E.2d 1225, 1232 (Mass. Ct. App. 2003); *see generally U.S.F. & G. v. Newell*, 505 So. 2d 284, 287 (Miss. 1987) (discussing restitution).

In this case, the pretrial order entered by the Court identified as a contested issue of law whether "[i]f Alita Mitchell is not found to have unduly influenced Don, can she nevertheless be liable for damages for any undue influence asserted by her son Craig that benefited her." This unambiguous reference to seeking recovery even in the absence of undue influence was sufficient to place Alita on notice that Phyllis and Ava intended to seek recovery from Alita of the assets subject to Craig's undue influence. *See Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 402 (5th Cir. 2013) ("Typically, we look to the pleadings and the pretrial order to determine whether proper notice of an issue was given before trial."). Accordingly, the question becomes whether Phyllis and Ava are entitled to restitution from Alita for the assets given to her due to the voided transfers.

Under Mississippi law, a recipient of money paid by mistake must make restitution to the owner of the money unless the recipient "significantly changed" her position in relying on receipt of the funds. *Newell*, 505 So. 2d at 287. Given this Court's finding of undue influence and the necessary voiding of the transfers, there can be no dispute that Alita received the life insurance

and CETERA funds by mistake. Because there is no evidence Alita detrimentally relied on the receipt of such funds, she is obligated to make restitution to Phyllis and Ava for the value of the life insurance funds and to Ava for the value of the CETERA account.

## V
## Punitive Damages

According to the pretrial order, Ava and Phyllis seek punitive damages for Craig and Alita's conduct. Craig and Alita contend that punitive damages are unwarranted under applicable law and that Phyllis and Ava did not seek punitive damages in their pleadings.

"[T]he award of punitive damages, along with the amount of such, are within the discretion of the trier of fact." *Bar-Til, Inc. v. Superior Asphalt, Inc.*, 164 So. 3d 1028, 1031 (Miss. Ct. App. 2014) (quoting *Hurst v. Sw. Miss. Legal Servs. Corp.*, 708 So. 2d 1347, 1350 (Miss. 1998)). "Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud." Miss. Code Ann. § 11- 1-65(1)(a). "Malice, in its legal sense, means a wrongful act done intentionally, without just cause or excuse." *McCorkle v. McCorkle*, 811 So.2d 258, 270 (Miss. Ct. App. 2001). "Malice is usually shown by circumstantial evidence and may be inferred from the fact that a defendant may have acted with reckless disregard for a plaintiff's rights." *Id*.

Even if the awarding of punitive damages would be justified, a court retains discretion to refuse to authorize such recovery. *Aqua-Culture Techs., Ltd. v. Holly*, 677 So. 2d 171, 185 (Miss. 1996). "The totality of the circumstances and the aggregate conduct of the defendant must be examined before punitive damages are appropriate." *Bradfield v. Schwartz*, 936 So. 2d 931, 937 (Miss. 2006).

Here, while Phyllis and Ava have prevailed on claims of restitution and undue influence, they have not introduced clear and convincing evidence that either Craig or Alita acted with actual malice, committed actual fraud, or acted with gross negligence with regard to the safety of others. First, there is no allegation or indication that either Craig or Alita committed actual fraud or committed any act which would have posed a danger to others. Furthermore, the only proven conduct of Alita was her acceptance of money which then had been left to her by her husband, an act which falls well short of the legal definition of malice. Finally, while the evidence supports a finding of undue influence against Craig, there is no evidence as to the manner in which Craig allegedly influenced Don. In the absence of such evidence, the Court cannot conclude that Craig's actions were taken without just cause or excuse. Accordingly, the Court finds punitive damages inappropriate in this case.

## VI
## Vulnerable Persons Act

As listed in the pretrial order, Ava and Phyllis assert claims against Alita and Craig under Mississippi's Vulnerable Persons Act. They also seek treble damages under Mississippi's Vulnerable Adult Act.

The Mississippi Vulnerable Persons Act of 1986 ("MVPA"), Miss. Code Ann. § 43-47-1, et. seq., prohibits an array of conduct against a vulnerable person. The MVPA does not provide for a private right of action. *Allstate Life Ins. Co. v. Parnell*, 292 F. App'x 264, 276 (5th Cir. 2008). To the extent Phyllis and Ava purport to assert claims under the MVPA, their claims must fail, and Craig and Alita's motion to dismiss such claims will be granted.

However, under Mississippi law:

> In a civil action where it is proven that a person took property having a value of Two Hundred Fifty Dollars ($250.00) or more belonging to a vulnerable adult by conversion, embezzlement, extortion, theft or fraud without the owner's consent,

> or obtained the owner's consent by intimidation, deception, undue influence or by
> misusing a position of trust or a confidential relationship with the owner, then
> whether the action is to recover the property or damages in lieu thereof, or both,
> damages shall be recoverable up to three (3) times the amount of the monetary
> damages or value of the property embezzled, converted or otherwise stolen, in
> addition to any other damages.

Miss. Code Ann. § 11-7-165. To invoke this statute, known as the Vulnerable Adult Statute

("VAS"), a plaintiff must show a defendant "took property having a value of $250 or more," from

a vulnerable adult, by one of the prohibited means. *Anderson v. Wiggins*, No. 2017-CT-607, 2020

WL 830767, at *4 (Miss. Feb. 20, 2020).

This Court directed the parties to address whether Phyllis and Ava had standing to invoke

this provision. Craig and Alita argued that Phyllis and Ava "do not have standing to bring an

action under the [VAS] because they are not the proper party holding the claim. The injury being

asserted is exploitation of Don Mitchell who is now deceased." Phyllis and Ava, citing

Mississippi's general law on standing, argue that under Mississippi law they have standing "in this

litigation" because they were the designated beneficiaries of the Assets.

"State law of standing ... does not govern such determinations in the federal courts."

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262 n.8 (1977).

Accordingly, Mississippi law on the issue has no bearing on Phyllis and Ava's standing to invoke

§ 11-7-165. The total failure to attempt to apply appropriate law in response to this Court's

directive amounts to a waiver of their claim under the statute. *See generally Pratt v. Mutual of

Omaha Ins. Co.*, No. 4:15-cv-9, 2016 WL 1248885, at *8 (N.D. Miss. Mar. 28, 2016) (failure to

adequately respond to standing challenge resulted in waiver of claim) (collecting cases).

Even if Phyllis and Ava had standing to invoke this provision, they would not be entitled

to enhanced damages. The statute, by authorizing damages *up to* three times the amount of the

monetary damages, grants a court *discretion* to increase damages. Because this Court concludes

that the damages authorized above adequately compensate Phyllis and Ava for their damages and because the Court has concluded that punitive damages are inappropriate, it finds that enhanced damages are inappropriate in this case. *See generally Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 777–78 (11th Cir. 2011) (noting treble damages provisions may be compensatory or punitive).

## VII
## Conclusion

For the reasons above, Craig and Alita's oral motion to dismiss Phyllis and Ava's MVPA claims is **GRANTED**. As to the remaining claims, judgment will be entered in favor of Ava and Phyllis in accordance with the findings and conclusions above.

**SO ORDERED**, this 31st day of March, 2020.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**